Harry Berke and Minnie Berke v. Commissioner. Harry Berke v. Commissioner.
Berke v. Commissioner
Docket Nos. 52398, 52399.
United States Tax Court
T.C. Memo 1956-259; 1956 Tax Ct. Memo LEXIS 33; 15 T.C.M. (CCH) 1354; T.C.M. (RIA) 56259; November 21, 1956
*33 The net worth method was relied upon by respondent for the years 1943 to 1951, inclusive, to determine deficiencies in the income tax (and additions to tax under sections 293(b) and 294(d), 1939 Code) of petitioner Harry Berke, a well-known member of the Bar, and his wife, under circumstances in which for all years involved a careful investigation failed to disclose any inaccuracy in petitioner's books and records except one error, reasonably explained, in the year 1949 and stipulated herein. There nevertheless remain unexplained increases in net worth for the years 1949 (in addition to the item explained), 1950 and 1951, after appropriate adjustments including reflection of cash and notes on hand at the beginning of the period and mortgage payable at the end of 1951. Held: 1. That there were no understatements of taxable income for any of the years involved except 1949, 1950 and 1951. Amounts of these understatements determined. 2. That respondent has failed to establish fraud by clear and convincing evidence for any of the years involved. 3. That respondent is barred by limitations from assessment and collection of any deficiencies for the years 1943 to 1946, inclusive. *34 4. Any additions to tax due to substantial underestimate of estimated tax under section 294(d)(2) for 1947, 1948, 1950 and 1951, will be determined under Rule 50. Charles A. Maner, Esq., for petitioners. James R. Harper, Jr., Esq., for respondent. FISHER
The respondent determined the following income tax [1] deficiencies and additions to tax for the years involved in these consolidated causes: Addition to
Addition to
Tax Under
Tax Under
Docket No.
Year
Deficiency
Sec. 293(b)
Sec. 294(d)(2)
52399
1943
$ 556.90
$ 278.45
0
1944
2,596.26
1,298.13
$ 180.02
1945
4,966.84
2,507.54
305.85
1946
5,561.88
2,780.94
347.94
1947
4,107.49
2,053.74
268.16
52398
1948
7,042.50
3,521.25
473.07
1949
20,242.14
10,121.07
1,129.73
1950
3,334.89
1,667.44
792.96
1951
3,351.76
1,675.88
353.78
The respondent's motion to conform the pleadings to the proof, after due consideration of petitioners' reply brief resisting the motion, was granted and amendment to the answer in each case was filed by respondent praying for increased deficiencies *35 consistent with our Findings and Opinion. The issues involved are: (1) whether there were understatements of income in petitioners' returns for any of the years involved, and if so, the amount thereof; (2) whether a part of any deficiency for any of the years involved was due to fraud with intent to evade taxes; (3) whether the statute of limitations bars assessment and collection for any of the years involved; and (4) whether any additions to tax are due for substantial underestimates of estimated tax under section 294(d)(2) for any of the years involved. Findings of Fact All of the facts variously stipulated in writing and orally, throughout these proceedings, are incorporated by this reference. Petitioner Harry Berke, a resident of Chattanooga, Tennessee, filed timely individual income tax returns on the cash basis for the years 1943 to 1947, inclusive, with the then collector of internal revenue for the district of Tennessee. For the years 1948 to 1951, petitioners Harry and Minnie Berke, husband and wife, and residents of Chattanooga, Tennessee, filed timely joint income tax returns on the cash basis with the then collector of internal revenue for the district of Tennessee. *36 The respondent's notice of deficiency for the taxable years in each consolidated cause was mailed on January 15, 1954. Harry Berke was born in Lithuania in 1911 and came to this country with his family in 1917. They lived in Brooklyn, New York, until petitioner was 13 years old. Then, in 1925, they moved to Chattanooga, Tennessee. During his early years in Chattanooga, while achieving his high school, college and law school training, petitioner was employed or engaged in several businesses. None of the records of such businesses were available at the hearing. Harry worked in his brother's dry goods store "part-time" on school days and "full-time" on Saturdays and during summer vacations until graduation from high school, in 1928, and thereafter continued on a full-time basis for another year. His earnings, depending upon the amount of time he worked, ranged from $15 to $20 per week. He lived at home and, making reasonable allowance for some personal expenses and household contributions, was able to save, in all, $4,460 from these earnings. The money was kept by his mother in $5, $10 and $20 bills in a drawer of her dresser. He then attended the University of Chattanooga for one *37 and one-third years, leaving around Christmas of 1930. He defrayed his expenses while at the University by managing his fraternity house, as a freshman, in exchange for room or board, and from his earnings as a salesman in a shoe store on Friday afternoons and Saturdays. Early in 1931, he bought his brother's dry goods store by paying approximately $2,000 in cash from his savings and assuming around $2,500 of liabilities. The store was operated profitably until 1933 when it was ruined in a fire, and its operation discontinued after a fire sale. Harry's accumulated savings, together with the insurance proceeds collected as a result of the fire, then amounted to $9,640. He next acquired and successfully operated a garage business for about a year, selling it without profit in the spring of 1934. Harry had entered Chattanooga Law School in September 1931, where he attended in the evenings until June 1934. He continued to live in his parental home throughout and used part of his business income to defray his expenses. He was thereby able to keep an $11,750 fund of insurance proceeds and net savings intact upon completion of his law school studies. Harry was licensed to practice law in *38 September 1934. He then married his present wife, Minnie Berke, nee Pavlow, and moved in with her family to live. He took his money with him. His wife had by then accumulated $4,000 from her earnings as a department store clerk prior to their marriage, and received an additional $6,500 in engagement and wedding presents. They kept the money in a cedar chest in their bedroom. During the period in which they were engaged to be married, petitioners lost between $200 and $300 in a bank failure. Harry was employed by a carpet company as a salesman for a few months at $30 to $35 a week between the time he completed his law training and entered upon his first association in a local law firm at $21 a week (plus some earnings from his own cases) after receiving his license to practice. His law salary was gradually increased to $35 a week and, finally, he was receiving a percentage of the profits. The most he earned in any year was $1,500 to $2,000. By April 1940, Harry was able to save an additional $7,845 from his earnings. He then severed his association with that firm to organize a partnership (which lasted until July 1, 1948) with a local judge's son. The partnership floundered for about *39 a year and then grew successful. A son was born to the petitioners in 1938 and another in 1946. Around the time the first son was born, they moved in to live with Minnie's older married sister. They remained until 1940 when they acquired their own home for $4,400 and furnished it at a cost of $900. Harry had moved his cash money with him to his sister-in-law's house where he replaced it in the cedar chest. After petitioners moved into their own house, the cache (arranged in bundles of $100 and $1,000) was kept in a metal container under a trapdoor in a clothes closet behind the bathroom fixtures. Harry occasionally made loans in substantial amounts from this fund, prior to and during the taxable period. Harry never filed an income tax return prior to 1940 and did not consider that he earned enough in any such year, considering his exemption, to be liable to tax so as to warrant filing one. His return for 1940 showed no tax liability. In 1941 he paid $56 in tax and in 1942, $260. By 1943, with an additional $5,200 saved from the law partnership earnings, petitioners had accumulated $30,000 in cash and notes, exclusive of the amount spent on their new home. They gradually exhausted *40 it, as needed, over the taxable period. For purposes of day-to-day convenience, bank accounts (savings, checking and special, as hereinafter set forth) were maintained by petitioners (jointly), by the law partnership, and by Harry alone. Apart from a $250 lot in Glenwood and his home on Vine Street, both acquired in 1940, Harry thereafter began to acquire and hold other real property in greater or lesser amounts as reflected by the following schedule: 1944
1945
1946
1947
Park City
$1,000.00
$1,000.00
$1,000.00
$1,000.00
Lots - Glen-
wood
725.00
725.00
725.00
40th Street
5,850.00
Marion
County
1215 Market
Street
$8,000.00
$8,000.00
Carson
Street
1409 Market
Street
Richard City
Rossville
Blvd.
Fire Hall
Ron-Mar
Apartments
1003 E. 4th
Street
1948
1949
1950
1951
Park City
$1,000.00
$ 1,000.00
$ 1,000.00
$ 1,000.00
Lots - Glen-
wood
725.00
725.00
725.00
725.00
40th Street
5,850.00
5,850.00
5,850.00
5,850.00
Marion
County
$1,500.00
$ 1,500.00
$ 1,500.00
$ 1,500.00
1215 Market
Street
8,000.00
8,000.00
8,000.00
8,000.00
Carson
Street
3,000.00
3,000.00
3,000.00
1409 Market
Street
37,683.68
Sold
11-1-50
Richard City
9,000.00
9,000.00
Rossville
Blvd.
15,000.00
15,000.00
Fire Hall
15,000.00
15,000.00
15,000.00
Ron-Mar
Apartments
157,452.75
1003 E. 4th
Street
2,400.00
*41 Except for "1409 Market Street" (where cash was deposited to cover a check) all of the foregoing properties were paid for with cash. The properties were retained for the production of rental income, and were on hand at the end of the taxable period here involved. Harry had also acquired a $17,100 "Dodd Street" property in 1948 as trustee for his mother-in-law, which he exchanged in 1950 in partial payment for a $35,000 "Poplar Street" property acquired for his own account, which he, in turn, sold that same year. As a result of the "Dodd-Popular" exchanges, petitioner became indebted to his mother-in-law in 1950 in the amount of $17,000 (for which a note and a deed of trust were executed and filed) and liquidated the indebtedness before the end of 1950 when the Poplar Street property was sold. For purposes of the "Carson City" acquisition, he had borrowed $6,500 from his mother-in-law, which amount was represented by executed and recorded notes and deed of trust, and was still owing at the end of 1951. Then outstanding, in addition, was the amount of $54,620 which petitioner had borrowed from his mother-in-law at various times during 1951 to defray part of the cost of his "Ron-Mar *42 Apartments" development (and for which aggregate sum petitioners had executed a deed of trust in 1951), a $48,000 first mortgage indebtedness incurred for the same purpose, and $8,179.96 of "Accounts Payable - Ron-Mar Apartments." Petitioners' tax returns for the years 1943 to 1951, inclusive, reflect the following respective sources and amounts of taxable net income: Year
Sources
Amounts
1943
Law practice, meat and grocery
$ 4,747.27
$ 783.43
$ 130.00
market, interest
1944
Law practice, meat and grocery
5,230.69
404.43
21.00
market, interest
1945
Law practice, rents, interest
5,658.21
38.56
45.00
1946
Law practice, rents, interest
7,511.03
39.44
82.00
1947
Law practice, rents, interest
7,958.58
105.88
105.00
1948
Law practice, rents, interest
11,501.86
1,590.70
80.00
1949
Law practice, rents, interest
21,017.34
2,218.19
96.75
1950
Law practice, rents, long-term
32,593.35
9,030.93
2,168.01
capital gain
1951
Law practice, rents, interest
26,042.19
1,727.97
1,018.08
Petitioners' assets and liabilities, together with other material factors, for the taxable period, variously stipulated throughout the *43 course of these proceedings and not heretofore specifically mentioned were: ASSETS
12/31/42
12/31/43
12/31/44
12/31/45
12/31/46
Cash in Banks: Berke & Fleming Checking
$ 164.62
$ 362.67
$ 208.90
$ 939.12
$ 1,518.95
A/C, A.N.B. & Tr. Co.
Berke & Fleming Special
Checking A/C, A.N.B. &
Tr. Co.
Harry Berke, Attorney,
Special Checking A/C,
A.N.B. & Tr. Co.
Mr. & Mrs. Harry Berke,
47.49
680.45
241.66
3,180.55
96.53
Checking A/C, A.N.B. &
Tr. Co.
Mrs. Harry Berke, Savings
1,393.33
207.29
212.37
214.49
216.63
A/C, A.N.B. & Tr. Co.
Ron-Mar Apartments,
Checking A/C, A.N.B. &
Tr. Co.
Mortgage Receivable
1,592.37
War Bonds
4,500.00
9,450.00
15,131.25
15,356.25
15,356.25
Notes Receivable
Inventory-Avondale Meat
750.00
950.00
Market
Coleman Products - Stock
Investors Syndicate
112.00
Other Assets: Auto - Chrysler & Buick
1,250.00
1,250.00
1,250.00
1,250.00
1,250.00
Office Equipment
250.00
250.00
250.00
250.00
250.00
Office Books
800.00
800.00
800.00
800.00
900.00
Fixtures
980.00
Fixtures - 321 Chestnut
St.
LIABILITIES
Reserve for Depreciation
981.66
1,336.66
1,724.66
1,949.00
2,164.58
Penn Mutual Life
Insurance Co.
Mortgage Payable
Other
Living Expenses
3,000.00
3,000.00
3,000.00
3,000.00
Income Tax Paid
195.12
1,117.63
1,129.03
882.40
Long-Term Capital Gain
*44 ASSETS
12/31/47
12/31/48
12/31/49
12/31/50
12/31/51
Cash in Banks: Berke & Fleming Checking
$ 96.50
A/C, A.N.B. & Tr. Co.
Berke & Fleming Special
$ 1,352.96
$ 77.75
$ 77.75
$ 77.75
Checking A/C, A.N.B. &
Tr. Co.
Harry Berke, Attorney,
2,659.29
8,012.01
6,532.04
Special Checking A/C,
A.N.B. & Tr. Co.
Mr. & Mrs. Harry Berke,
407.84
62.47
598.94
27,651.25
560.20
Checking A/C, A.N.B. &
Tr. Co.
Mrs. Harry Berke, Savings
218.79
220.97
223.18
225.41
227.66
A/C, A.N.B. & Tr. Co.
Ron-Mar Apartments,
4,074.64
Checking A/C, A.N.B. &
Tr. Co.
Mortgage Receivable
2,477.37
4,034.11
8,273.23
11,262.12
11,618.35
War Bonds
15,356.25
15,356.25
22,856.25
22,856.25
22,856.25
Notes Receivable
19,810.39
4,413.52
Inventory-Avondale Meat
Market
Coleman Products - Stock
3,000.00
3,000.00
Investors Syndicate
224.00
336.00
448.00
560.00
672.00
Other Assets: Auto - Chrysler & Buick
1,250.00
1,250.00
3,250.00
3,250.00
3,250.00
Office Equipment
250.00
250.00
250.00
250.00
250.00
Office Books
1,150.00
1,425.00
1,648.00
1,889.70
2,021.70
Fixtures
980.00
1,180.00
1,205.00
1,555.00
1,615.00
Fixtures - 321 Chestnut
1,000.00
1,000.00
St.
LIABILITIES
Reserve for Depreciation
2,799.38
3,973.03
5,951.22
7,143.91
11,107.63
Penn Mutual Life
14,762.68
Insurance Co.
Mortgage Payable
6,000.00
Other
Living Expenses
3,000.00
3,000.00
3,500.00
5,000.00
7,000.00
Income Tax Paid
1,037.11
1,366.51
2,291.96
5,386.74
16,381.19
Long-Term Capital Gain
(2,168.01)
*45 Included in petitioner's assets as of January 1, 1943, were fixtures of the Avondale Meat Market, which was operated by him in 1943 and part of 1944. We find as an ultimate fact that the basis therefor was $1,500 as of January 1, 1943. The meat market was sold on July 22, 1944. Petitioner's father-in-law, Max Pavlow, had operated a grocery and wholesale meat business in Chattanooga from 1914 until his death in 1935. The only personal assets of his estate with which his wife, Luba, declared herself chargeable as administratrix, consisted of a $377.59 stock of groceries and a $100 equity in store fixtures. These were awarded to her in satisfaction of her statutory right to a year's support as wife of the deceased. Final settlement of the estate was made in June 1937. Real estate (not included in the personal asset inventory) in the amount of at least $17,500, which had been acquired by the Pavlows on or about January 1, 1935, was also on hand. After the estate was settled, Luba Pavlow also moved in with her older married daughter to live. The aforementioned real estate was held for rental purposes and the net income therefrom was accumulated by Luba Pavlow and kept in a cedar chest. *46 This amounted to at least $14,000 for the 11-year period, 1941 to 1951, inclusive. In addition, she had collected approximately $19,000 in life insurance proceeds upon her husband's death. Luba Pavlow acquired additional real estate in the amounts of $10,000, $1,500 and $6,000 in 1944, 1945, and 1948, respectively. A tin shop and a frame duplex house acquired in July 1944 at a cost of $4,500 and depreciated in the total amount of $300 were disposed of during 1946 with no gain or loss reported. All of the other real estate was on hand at the close of 1951. Luba Pavlow contributed each year to the household expenses out of her own funds while living with her daughter. Occasionally she made substantial loans to her older daughter which were repaid. Luba Pavlow was nearly 70 years old and infirm at the time of the hearing of the instant case. Petitioner maintained books and records of his income and expenses from all sources for the years in question. The books were kept by his secretary. Legal fees and rents, whether paid in cash or check, were receipted. A record of all damage suits filed within the county where petitioner practiced was kept in the Circuit Clerk's Office. The record *47 reflected settlements as well as judgments. Petitioner's practice was predominantly devoted to civil tort actions. Petitioner also kept separate envelopes for each parcel of real estate wherein all financial and other pertinent records were kept. At the close of each year, petitioner's secretary prepared typewritten schedules directly from the books and records to be used in the preparation of the income tax returns. The income tax returns were prepared by Berke's older brother, who received the information from the secretary, checked the adding machine totals and set up the required schedules. Petitioner's tax returns for the years involved were investigated by a revenue agent. Petitioner cooperated fully and had preserved all of his original books and records which he made available. The revenue agent made spot-checks of third-party records to verify petitioner's record of fees and examined the Circuit Clerk's register thoroughly. The agent found no inaccuracies or inadequacies in the books and records except the one item in 1949 referred to below. He found that bank statements and bank deposits reconciled closely with the gross receipts reported per books. The only inaccuracy *48 discovered (which the agent found without difficulty from Berke's records) was the omission of an item of $6,666.66 in 1949 arising in relation to Berke's accounting with his partner at the time of the dissolution of their partnership. We find that the omission (the amount of which has been stipulated) was unintentional, and not fraudulent. The revenue agent decided to apply the net worth test after his preliminary investigation because petitioners' net worth increases did not appear to be consistent with the income which had been reported in prior years. Harry explained to the agent that the apparent discrepancy was accounted for by loans from his mother-in-law in 1951 in the amount of $54,620 and the exhaustion of a $30,000 accumulation of cash and notes on hand at the beginning of the period. Harry Berke is a well-known member of the legal profession whose reputation for truth and veracity is good. His wife's reputation for truth and veracity is likewise good. The following is a schedule of the cash and notes on hand at January 1, 1943, and the extent to which it was exhausted by years throughout the period (see Appendix A): On Hand
January 1, 1943
$30,000.00
January 1, 1944
28,025.61
January 1, 1945
26,308.33
January 1, 1946
23,524.18
January 1, 1947
25,707.51
January 1, 1948
24,486.64
January 1, 1949
29,909.33
January 1, 1950
January 1, 1951
*49 The understatements of income for the years involved are as follows (see Appendix A): Year
Amount
1943 to 1948, inclusive
1949
$ 8,513.04
1950
18,222.99
1951
6,461.25
Exhibit L (Respondent's Computation of Income on the Net Worth Basis) is incorporated herein by reference solely as a basis for explanation of respondent's position. Such position, however, was later altered in some respects by concessions and stipulations, so that, in order to fully reflect respondent's contentions, the following adjustments for specific asset and liability items must be made to Schedule L: Year
Item
Amount
1946
Loan from Mrs. Pavlow (still
outstanding at 12/31/51)
$ 6,500.00
1948
Loan from Mrs. Pavlow (liqui-
dated in 1950)
17,000.00
1949
Loan from Penn Mutual Life
Insurance Co. (liquidated in
1950)
14,762.68
1949
Increased cost of 1409 Market
St. (liquidated in 1950)
183.68
1951
Checks outstanding at 12/31/51
557.37
Appendix A, following immediately hereafter, summarizes the adjustments which we, ourselves, have made, together with the basis for each. APPENDIX A
1943
1944
Net worth increase deter-
mined by respondent to be
due to understatement of
current income
$1,974.39
$7,637.28
Less: Amount attributable to ex-
haustion of cash & notes
on hand at Jan. 1, 1943
1,974.39
$1,717.28
Amount attributable to liq-
uidation of Avondale Meat
Market fixtures
1,500.00
Amount attributable to re-
spondent's gradual cash
accumulation theory (see
discussion in Opinion,
infra.)
4,420.00
Amount attributable to ad-
ditional loans from moth-
er-in-law
Total
$7,637.28
Plus: Amount attributable to re-
moval of $17,000 asset &
$17,000 liability from com-
putation for 1948 & 1949
Redetermined understatement
of current income
*50 APPENDIX A
1945
1946
Net worth increase deter-
mined by respondent to be
due to understatement of
current income
$12,784.15
$7,816.67 [1]
Less: Amount attributable to ex-
haustion of cash & notes
on hand at Jan. 1, 1943
$ 2,784.15
($ 2,183.33)
$ 1,220.87
Amount attributable to liq-
uidation of Avondale Meat
Market fixtures
Amount attributable to re-
spondent's gradual cash
accumulation theory (see
10,000.00
discussion in Opinion,
infra.)
10,000.00
Amount attributable to ad-
ditional loans from moth-
er-in-law
Total
$12,784.15
$7,816.67
Plus: Amount attributable to re-
moval of $17,000 asset &
$17,000 liability from com-
putation for 1948 & 1949
Redetermined understatement
of current income
APPENDIX A
1947
1948
Net worth increase deter-
mined by respondent to be
due to understatement of
current income
$11,220.87
$4,677.31 [2]
Less: Amount attributable to ex-
haustion of cash & notes
on hand at Jan. 1, 1943
($ 5,422.69)
$29,909.33
Amount attributable to liq-
uidation of Avondale Meat
Market fixtures
Amount attributable to re-
spondent's gradual cash
accumulation theory (see
10,000.00
10,000.00
discussion in Opinion,
infra.)
Amount attributable to ad-
ditional loans from moth-
er-in-law
Total
$11,220.87
$4,577.31
Plus: Amount attributable to re-
moval of $17,000 asset &
$17,000 liability from com-
putation for 1948 & 1949
(100.00)
Redetermined understatement
of current income
*51 APPENDIX A
1949
1950
Net worth increase deter-
mined by respondent to be
due to understatement of
current income
$28,422.37 [3]
$38,122.99 [4]
Less: Amount attributable to ex-
haustion of cash & notes
on hand at Jan. 1, 1943
Amount attributable to liq-
uidation of Avondale Meat
Market fixtures
Amount attributable to re-
spondent's gradual cash
accumulation theory (see
(10,000.00)
20,000.00
discussion in Opinion,
infra.)
Amount attributable to ad-
ditional loans from moth-
er-in-law
Total
$19,909.33
$18,122.99
Plus: Amount attributable to re-
moval of $17,000 asset &
$17,000 liability from com-
putation for 1948 & 1949
100.00
Redetermined understatement
of current income
$ 8,513.04
$18,222.99
APPENDIX A
1951
Net worth increase deter-
mined by respondent to be
due to understatement of
current income
$6,661.25 [5]
Less: Amount attributable to ex-
haustion of cash & notes
on hand at Jan. 1, 1943
Amount attributable to liq-
uidation of Avondale Meat
Market fixtures
Amount attributable to re-
spondent's gradual cash
accumulation theory (see
($54,420.00)
discussion in Opinion,
infra.)
Amount attributable to ad-
ditional loans from moth-
er-in-law
54,620.00
200.00
Total
$6,461.25
Plus: Amount attributable to re-
moval of $17,000 asset &
$17,000 liability from com-
putation for 1948 & 1949
Redetermined understatement
of current income
$6,461.25
*52 *53 Opinion Respondent's Use of Net Worth Method FISCHER, Judge: Petitioner argues that his books and records were accurate and adequate on their face (except for the error of $6,666.66 in 1949, which has been stipulated) and that there was no justification for respondent's use of the net worth method. We cannot agree with this view. We think that the use of the method was appropriate here, both as a test of the accuracy and completeness of petitioner's income tax returns and as evidence of his correct net income. Respondent's investigation indicated substantial increases in net worth, over the period involved, which appeared to exceed materially the income as reported on the tax returns. Petitioner's explanations, if accepted, explained the apparent inconsistencies in large measure, but respondent was not bound to accept the explanations as true. Such explanations, and the seeming accuracy of the books, did not necessarily rule out substantial omissions from the books and tax returns. The net worth method, correctly applied, is an appropriate method of testing such possibilities. See ; . *54 The respondent's use of the method was therefore proper. It hardly need be added, however, that the results indicated by the use of the method are open to explanation and refutation. Understatments of Income The determination of deficiencies made by respondent in his statutory notice are, of course, prima facie correct, and the burden is upon petitioner to show error. The burden shifts to respondent, however, to the extent of any affirmative claims for additional deficiencies not determined in his statutory notice. The only year in which such affirmative claim becomes material in the light of our holdings, infra, is 1950. Since the burden is upon petitioner, with the exception indicated above, the key question is whether or not we believe the testimony offered on petitioner's behalf, and particularly the testimony of Harry Berke himself. That this question would be significant was apparent at the trial of the case itself, and we were particularly vigilant in observing him on the stand. Our observation impressed us with the fact he was an honest and candid witness. Moreover, our view was reinforced by the high caliber of the character witnesses produced by him, all of whom testified *55 with obvious sincerity as to his good character. We have also considered the fact that he had kept, and made available to the investigating agent and at the trial, all of the records of his income from his law practice and the details concerning his income, deductions and transactions relating to real estate. Much of his records could be (and were) checked and verified by the investigating agent, disclosing only the one specific omission in 1949 which was explainable and excusable under the circumstances under which it occurred. We were likewise favorably impressed with the testimony of Mrs. Berke, George Berke (Harry's brother), Mrs. Slutzky (Mrs. Berke's sister) and Mrs. Adams (Harry's secretary, who kept his books). Mrs. Pavlow, an elderly lady, did not testify, but petitioner introduced a statement from her physician that she was being treated for an enlarged heart, extremely high blood pressure and gall bladder disease with stones, and could not appear. We are, of course, aware of the suspicious circumstance that Berke testified he kept his money at one period in a cedar chest, and at another time in a metal container. Such a factor requires careful scrutiny and consideration *56 on our part. Nevertheless, the detailed calculations which underlie our Findings regarding the gradual accumulations from petitioner's activities prior to 1943 demonstrate that Berke could well have accumulated the amounts which he asserted he had at the beginning of the net worth period, and in view of all of the testimony supporting a belief in his good character, we adhere to our belief in his testimony to the effect that petitioners had on hand $30,000 in cash and notes at the beginning of 1943 which they used or exhausted over the period as required. The testimony was likewise to the effect that Mrs. Pavlow kept her money in a cedar chest. Whatever doubts we might otherwise have on this score, there appears to be sufficient proof that she owned substantial real estate, received rental income from it, had little expense, and could have accumulated enough funds to have made the loans to Berke which he claimed to have been made. The latter fact is further corroborated by the contemporaneous records of such loans made by petitioner's secretary, and the execution by petitioners of a note and deed of trust in her favor on the newly constructed "Ron-Mar Apartment" property as security *57 for the full amount of the loans. We next consider the year-by-year determination of whether there were understatements, and, if so, in what amounts. Our discussion will be keyed to Appendix A, supra. As to 1943, the increase on the net worth basis determined by respondent was $1,974.39. Respondent allowed nothing for cash and notes on hand at the beginning of the period. Since we have found that petitioner had $30,000 of cash and notes at this time, and that this amount was availed of as required from year to year, we attribute $1,974.39 of said cash and notes to 1943, eliminating any deficiency for that year, but reducing the cash and notes by the same amount as of the end of the year. As to 1944, the increase determined by respondent on the net worth basis was $7,637.28. Respondent failed, however, to allow in opening net worth for that year any amount attributable to Avondale Meat Market fixtures (which were disposed of in 1944). We think the evidence supports an opening allowance of $1,500, for which we make appropriate adjustment. Likewise in 1944, respondent includes in closing cash on hand the sum of $4,420. Since the principle upon which respondent proceeded affects *58 his computation in succeeding years also, we discuss this item in some detail to avoid later repetition. It is referred to in Appendix A as "attributable to respondent's gradual cash accumulation theory." Respondent calculated that petitioner had cash on hand as of December 31, 1950, in the amount of $54,420, which respondent attributed to an accumulation of earnings during the years 1944 to 1950, inclusive. (Respondent took this position because he rejected petitioner's explanation that the availability of funds in 1951 in nearly the same amount was due to loans from Mrs. Pavlow in that year.) Respondent then back-cast this sum in arbitrary amounts to the years in question. The amount attributed to cash on hand as of December 31, 1944, was $4,420. We have found, however, that petitioner did not have this, or any other amount of cash on hand as of December 31, 1950, but that petitioner borrowed $54,620 from his mother-in-law in 1951. We hold that the record contradicts respondent's "gradual cash accumulation theory" and that the amounts back-cast on this theory must be eliminated. We have determined in our Findings the amount of cash and notes which petitioner had on hand at the beginning *59 and end of 1944, and therefore eliminate the back-cast item of $4,420. The only other adjustment for 1944 is to attribute $1,717.28 to use of cash and notes on hand at the beginning of the taxable period, resulting in a determination of no understatement for 1944. Cash and notes on hand at the end of the year are reduced accordingly. For the year 1945, in which we again find no understatement, the adjustments are the same in principle as in 1944, although the amounts differ. Since the increase determined by respondent and the amounts and bases for the balancing adjustments are reflected in Appendix A, no further discussion is required. As to 1946, the understatement originally determined by respondent was $14,316.67, but the claimed amount has been reduced to $7,816.67 by respondent to reflect a $6,500 loan from Mrs. Pavlow. For the reasons stated with respect to 1944, we have eliminated the back-cast item of $10,000 which reflected respondent's "gradual cash accumulation theory." Here, however, we increase cash and notes on hand as of December 31, 1946, in the amount of $2,183.33, to reflect the excess of petitioner's reported adjusted gross income over the increase determined *60 by respondent adjusted by reflecting the $6,500 loan and elimination of the $10,000 back-cast item. We find no understatement for 1946. For the year 1947, in which we likewise find no understatement, the adjustments are the same in principle as in the years 1944 and 1945, although again the amounts differ. Since the increase determined by respondent and the amounts and bases for the balancing adjustments are here also reflected in Appendix A, no further discussion is required. With regard to 1948, the understatement originally determined by the respondent was $21,677.31. On brief, the respondent has reduced this amount to $4,677.31 since he is willing to concede that the Dodds Avenue property was acquired with Mrs. Pavlow's money and an additional $17,000 liability should be reflected therefor in the net worth computation. We have reached substantially the same result by our determination that when the parcel was acquired with Mrs. Pavlow's funds, it was taken in trust for her. As a result, we hold that the item should be entirely removed (both the $17,100 asset and the offsetting $17,000 liability) from the net worth computation. Accordingly, an adjustment is required in 1948 *61 to account for the $100 lesser net asset increase over 1947, which is accomplished by reflecting a $100 greater excess of reported income ($13,172.56) over the adjusted net asset increase ($3,383.36 instead of $3,483.36) plus nondeductible expenditures ($4,366.51) to be aded back to the cash and notes on hand account. (The total amount so added back, as reflected in Appendix A, is $5,422.69.) The converse of the $100 adjustment will be made in 1950 to account for the otherwise understated net asset increase in 1950 over 1949. (See discussion, infra.) The $10,000 adjustment in Appendix A for 1948 (which is reflected in determining the net adjusted asset increase of $3,383.36 referred to above) is the same in principle as that for prior years in which we eliminated amounts attributable to respondent's "gradual cash accumulation theory." The balancing adjustments set forth above result in no understatement for 1948. For the year 1949, we find an understatement of $8,513.04. Of this amount, $6,666.66 is attributable to an admitted omission covered in our Findings of Fact. The balance is established by the affirmative evidence of the net worth increase and nondeductible expenditure *62 factors involved for the particular year. Analyzing the factors on a net worth basis, as keyed to Appendix A, respondent's original determination of understatement was $43,001.37. Respondent reduced this to reflect the sum of $14,762.68, representing a loan from Penn Mutual Life Insurance Co., together with an adjustment of $183.68 to reflect stipulated increased cost over that originally reflected for 1409 Market St. property. In addition, we have eliminated a decrease of $10,000 in respondent's determination of cash on hand attributable to respondent's "gradual cash accumulation theory." While in this year, the elimination of the $10,000 factor relates to a decrease rather than an increase (as in 1944 to 1948, inclusive), the basis for the elimination is the same as that already indicated with respect to the arbitrary increases for the earlier years. We likewise exhaust the balance of petitioner's cash on hand as of January 1, 1949, ($29,909.33), leaving this item at zero for December 31, 1949. The net result is the understatement for 1949 of $8,513.04 above referred to. As to 1950, we find an understatement of $18,222.99. Our adjustments are as follows: Respondent's original determination *63 of a $6,543.99 understatement must be increased in the amount of $17,100 because it was based upon the theory that $17,100 of the over-all net asset increase in that year was attributable to the liquidation of the Dodds Avenue parcel which, according to respondent's original determination, was owned outright by petitioner at the start of the year. However, as the respondent has since conceded, the petitioner did not own the Dodds Avenue property outright, there being a liability of $17,000 to Mrs. Pavlow, on respondent's theory, as of the beginning of 1950 which was liquidated in that year, or as we have determined (reaching substantially the same result), did not own it at all, at the beginning of 1950. Similarly, the stipulation at the hearing as to the existence of a $14,762.68 liability to the Penn Mutual Life Insurance Co. at the end of 1949 to offset, in part, the assets then on hand, which liability was liquidated in 1950, serves to further increase the understatement originally determined by respondent for 1950. A final and converse adjustment - to reflect the likewise stipulated increase of $183.68 - in the cost of the 1409 Market St. property on hand at the end of 1949 - *64 decreasing the originally determined understatement, results in a tentative understatement of $38,222.99 (being $100 in excess of the amount of $38,122.99 upon which the respondent relies on brief - see Footnote 4, Appendix A). The $100 difference will be explained below. As in the prior years, this amount must be further adjusted in accordance with our findings and the views earlier expressed in our Opinion regarding respondent's "gradual cash accumulation theory." The "gradual cash accumulation" elimination for the present period is $20,000. (See Appendix A.) The converse of the $100 adjustment made in 1948, when the $17,100 asset and its offsetting $17,000 liability first appeared, must now be made to account for the overstated net asset figure at the end of 1949 and the resulting $100 lesser net asset increase otherwise reflected for 1950. This is reflected in the figure of $38,222.99 (rather than the respondent's $38,122.99 adjusted understatement, calculated upon the concession that a $17,000 liability offsetting the $17,100 asset was owed at the end of 1949 which was liquidated in 1950) determined above in accordance with our view that the $17,100 property was not petitioner's *65 at all in 1948, 1949 or 1950. Respondent has, by amended answer, claimed such additional deficiency as may result from our determination. For the year 1951, we find an understatement of $6,461.25. The amount originally determined was $7,218.62, but this was first reduced to $6,661.25 because of checks in the amount of $557.37, outstanding as of December 31, 1951, as stipulated at the trial. Respondent gave petitioner credit, under his "gradual cash accumulation theory" for $54,420 cash on hand as of the beginning of 1951. For reasons already stated in principle in discussing earlier years, we have eliminated this item entirely. On the other hand, respondent has failed to allow to petitioner the amount of $54,620 which we have found was loaned to petitioner by Mrs. Pavlow in 1951 and still owing to her as of the end of that year. Offsetting the two adjustments referred to above results in a net reduction of $200, leaving the understatement of $6,461.25 for 1951. Referring generally to the question of deficiencies, petitioners' position is that they have returned all of their income in the years in question except for the $6,666.66 item in 1949. We have demonstrated by our *66 prior discussion, however, the basis for the understatements we have found for the years 1949, 1950 and 1951. Items not referred to in our discussion of the deficiencies are unchallenged for the purpose of the net worth computation. We have given petitioners the benefit of their claim of cash on hand and money borrowed from Mrs. Pavlow, and in addition, of course, the benefit of factors conceded or stipulated by respondent. Petitioners have completely failed to establish any facts explaining away the ultimate understatements determined by us for 1949, 1950 or 1951, by the net worth and expenditures method or warranting any further reduction in the amounts so determined. Proposed Additions to Tax under Section 293(b) Since we have found no understatement of income by petitioners for the years 1943 to 1948, inclusive, it is apparent that there is no fraud for any of said years. We have, however, found understatements of income for the years 1949, 1950 and 1951 in the respective amounts of $8,513.04, $18,222.99 and $6,461.25. As a basis for additions to tax for any year under section 293(b), the burden is upon respondent to establish by clear and convincing evidence that there *67 is a deficiency for such year and that some part of the deficiency is due to fraud with intent to evade tax. ; . A mere understatement of income does not of itself establish fraud. , affirmed (C.A. 8, 1937). The existence of fraud with intent to evade taxes must be affirmatively established. Circumstantial evidence may, of course, give rise to the inference of such intent. Respondent cannot, however, meet his own burden of establishing fraud on the basis of petitioners' failure to meet the burden of proving error in respondent's determination of deficiencies in tax. In the instant case, it is our view that respondent has failed to establish fraud by clear and convincing evidence. His sole reliance is upon proof of understatements by the use of the net worth plus expenditures method. The only specific item of omission found in the nine years covered by the investigation is the item of $6,666.66 in 1949 which we have already discussed. The error was apparent from Berke's records, readily explainable and wholly *68 lacking in the indicia of fraud. It is clear from the testimony of the investigating agent who found the item that he did not attribute fraud to it, and respondent does not argue on brief that it establishes fraud. As to the balance of the understatement in 1949 and the understatements in 1950 and 1951, we can only say that they are shrouded in mystery and brought to light solely by the application of the net worth and expenditures method. Not only has no specific omitted item (other than the $6,666.66 amount already considered for 1949) been brought to light, but no improper deduction suggestive of fraud has been discovered. No undisclosed source of income has been found. Moreover, the subject of the investigation was a well-known member of the Bar concerning whom it should not have been too difficult to bring to light circumstances implying fraud if such existed. We have already discussed the question of Berke's reputation and credibility in relation to the deficiency issues, and need not repeat the discussion here except to say that the favorable testimony of character witnesses of the caliber presented in the instant case should not be lightly disregarded but should receive *69 affirmative consideration in buttressing him against the charge of fraud. Upon consideration of the entire record, we fail to find facts or circumstances which we deem clear and convincing evidence of fraud, and we accordingly hold for petitioners on this issue. Limitations The defense of the statute of limitations was raised only with respect to the years 1943 to 1946, inclusive. Respondent's reply raises only the issue of fraud, and there is no suggestion that waivers were filed for any of the above years. Since we have found no fraud (or deficiencies) in these years, and since all of the returns in connection with which the limitations issue was raised were filed more than five years prior to the mailing of the statutory notice of deficiency, it is clear that the bar of the statute applies. Substantial Underestimate of Estimated Tax We think it apparent that the parties are now in a position to stipulate such additions to tax as may be due to substantial underestimate of estimated tax under section 294(d)(2) for any of the years 1947 to 1951, inclusive, as a basis for determination under Rule 50, and no discussion of this question is here required. Decisions will be *70 entered under Rule 50. Footnotes
1. 1943 involved "Income" and "Victory" taxes.↩
1. Originally determined to be $14,316.67 and reduced by respondent to reflect $6,500 loan from mother-in-law per notes and deed in trust in evidence. ↩
2. Originally determined to be $21,677.31 and reduced by respondent to reflect his concession of a $17,000 loan by petitioner from his mother-in-law per respondent's view of testimony. (But see our elimination in 1948 of both the asset and liability in relation to the Dodds Avenue property as explained infra in our Opinion.) ↩
3. Originally determined to be $43,001.37 and adjusted by respondent to reflect a $14,762.68 loan from Penn Mutual Life Insur. Co., outstanding at end of year, and a $183.68 increase in cost originally reflected for 1409 Market St. property, both stipulated. ↩
4. Originally determined to be $6,543.99 but increased by virtue of liquidation in 1950 of the liability of $14,762.68 to Penn Mutual Life Insurance Co., the $183.68 increased cost of the 1409 Market St. property (see Footnote 3), and the treatment of the Dodds Avenue property item as explained infra in our Opinion. ↩
5. Originally determined to be $7,218.62 and reduced by respondent for checks in the amount of $557.37 outstanding at 12/31/51, stipulated at hearing.↩